IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITRIN AUTO & HOME INSURANCE COMPANY, as subrogee of Shamsher Shamsher | : : : |
| Plaintiff, | : : |
| v. | : : : |
| K. HOVNANIAN HOMES OF MARYLAND, LLC, f/k/a Washington Homes of MD I LLC, et al., | Case No.:  1:11-cv-00118-RDB : : : : |
| Defendants. | : |

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT OMEGA FLEX INC.'S MOTION TO COMPEL FULL AND COMPLETE RESPONSES TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS**

**INTRODUCTION**

Omega Flex has requested from Plaintiff-Insurer Unitrin Auto & Home Insurance Company ("Unitrin"), subrogee of Shamsher Shamsher, "[a]ll documents identifying the number of claims Unitrin Auto & Home Insurance Company received between July 23, 2004 and July 23, 2009 that involved lightning damage to a one or two family residential building."  Exhibit A, Defendant's Requests for Production of Documents ("RPD"), No. 30.  Plaintiff has not provided any substantive response, but, instead, simply asserts general objections of privilege, confidential information, and that the request "seeks irrelevant and immaterial evidence, seeks information not likely to lead to discovery of admissible evidence, is vague, unduly burdensome and is unreasonably broad in scope."  Exhibit B, Plaintiff's Resp. to RPD, No. 30.

The discovery of claims experience information sought from Unitrin is relevant to the "risk" element of both the strict liability and negligence theories pled in this case.  The heart of

Plaintiff's claim in this case is that CSST presents an unreasonable risk of danger—when subjected to electrical currents caused by lightning—and that black iron pipe is a "safer" alternative design because its risk of failure is allegedly significantly less than Omega Flex's CSST product, "TracPipe."

To refute Plaintiff's risk-based argument, Omega Flex needs to discover Unitrin's basis for claiming that CSST presents an unreasonable risk. Omega Flex, therefore, seeks the data used by Unitrin in deciding when and against whom to file suit for losses incurred by its insureds as the result of a lightning strike, including comparisons of CSST to other appliances and/or systems within a home that reportedly were electrically charged and failed, allegedly causing a loss. Such relevant "risk" evidence is in the exclusive possession of Plaintiff. If the data shows that Unitrin received very few claims about alleged CSST failures from lightning, compared to a significantly larger number of lightning related claims to other systems in the home, such evidence is relevant to the credibility and reliability of Plaintiff's attempt to single out CSST as being unsafe.

Contrary to the deposition testimony recently given by Plaintiff's expert, Dr. Eagar, and contrary to his report, Omega Flex believes Unitrin's own claims will establish that CSST generally, and TracPipe specifically, do not present any unreasonable risk when compared to the risks presented by black iron pipe or other household systems when those systems react to lightning. Omega Flex has no way to know how many claims exist involving black pipe or other household systems in response to lightning. Omega Flex's discovery requesting claims experience information is tailored, relevant, and deserves substantive responses. At a minimum, Omega Flex should be entitled to depose a claims representative from Unitrin with knowledge of Unitrin's process of evaluating claims and assessing the relative risks associated with different

household systems and their responses to lightning strikes, to inform Omega Flex as to what makes a product or system, in Unitrin's view, "unreasonably dangerous."

## HISTORY OF THE CASE

### I.     BACKGROUND

Omega Flex is based in and has its sole manufacturing facility in Exton, Chester County, Pennsylvania. At the Exton facility on Creamery Way, Omega Flex designs, manufactures and even exports flexible hose and braid products, including a Corrugated Stainless Steel Tubing ("CSST") called TracPipe.

TracPipe offers significant advantages over traditional methods of distributing gas in homes. Its flexible design allows more efficient installation than traditional rigid gas pipes, and it can run safely and easily through new or existing construction in unbroken lines from a manifold to an appliance connector. When properly bonded in accordance with Omega Flex's Design and Installation Guide, CSST provides a similar, if not lower, risk than any other mechanical or electrical system in a home. Overall, any risk that does exist is minimal, even when the home is struck by the massive electrical forces contained in a bolt of lightning.

Unitrin is an insurance company in the business of assessing and evaluating the relative risks of the homes they insure. As inherent in that insurance business, Unitrin presumably insures a great number of homes with some sort of natural gas piping system—whether that system is traditional black iron piping or the newer CSST. Like any insurance company insuring homes against fire damage, Unitrin evaluates the number of fires, the causes of those fires, the relative incidents of those causes, and the various factors that, in their assessment, may contribute to those fires and thereby inform their underwriting procedures. Unitrin undeniably has received claims about lightning-related losses.

## II.  PLAINTIFF'S DEFECT ALLEGATIONS AGAINST OMEGA FLEX

Plaintiff, Unitrin, as subrogee of Shamsher Shamsher, initiated this lawsuit against Omega Flex, alleging causes of action in negligence, strict liability, and breach of implied warranties for the manufacture of a Corrugated Stainless Steel Tubing ("CSST") line.  See Exhibit D, Complaint.

Plaintiff claims in the Complaint that lightning struck near the Shamsher property, which was located at 13311 L'Enfant Drive, Waterford Cove Development, Fort Washington, Maryland 20744.  See Ex. D, Compl. ¶¶ 3, 19.  The CSST at the Shamsher property was not properly bonded to the home's grounding systems at the time of the lightning strike.  Ex. D, at ¶ 20.  Plaintiff claims that the lightning strike compromised the CSST and allowed gas to leak, igniting a fire at the property.  Ex. D, Compl. at ¶¶ 19-20.

Significant to this motion, Plaintiff claims that Omega Flex "supplied and/or distributed the CSST into the stream of commerce with an inherently and dangerously defective design."  Ex. D, Compl. at ¶ 31.  Plaintiff further claims that Omega Flex "became aware that CSST was prone to become damaged and/or perforated during electrical storms unless the CSST systems in a residence were properly bonded to the residence's electrical systems, which damage and/or perforations would permit the uncontrolled flow of gas into a residence."  Ex. D, Compl. at ¶ 17.  Also, Plaintiff alleges that Omega Flex failed "to take necessary and reasonable precautions in order to safeguard the Subject Property from risk of fire."  Ex. D, Compl. at ¶ 22(b).

Plaintiff's asserted claims, therefore, directly implicate the risk-utility balancing analysis between TracPipe and other products that Plaintiff asserts constitute safer alternative designs, such as black pipe.  See, e.g., Exhibit E, Eagar Report at 3, ¶ 2.  Such an analysis requires that Omega Flex, the Court, and the jury possess full knowledge of the relative risks and benefits not

only of TracPipe, but of other methods of transporting natural gas within homes, as well as the relative risks of other household systems that may cause home fires and property damage when energized by a lightning strike. Omega Flex, therefore, seeks information on the numbers, statistics, and other factors of lightning-related home fire claims, all of which Unitrin records in its ordinary course of business and which are highly relevant to the underlying basis of Plaintiff's design defect claim. As Unitrin is in a unique position to access such statistical claims information, Omega Flex seeks to discover this information, and to the extent it may directly refute and contradict Plaintiff's claims against Omega Flex, present it to the Court and/or the jury as the Court deems appropriate.

### III.   OMEGA FLEX'S WRITTEN DISCOVERY REQUESTS

In order to establish the minimal risk (overall and when compared to other systems in homes) of a fire involving an alleged CSST failure, Omega Flex sought discovery of claims experience of Unitrin. Specifically, Omega Flex sought information in Unitrin's possession relating to the risk of residential fires and the relative risks of the causes of those fires. Accordingly, Omega Flex served written discovery on Plaintiff on April 29, 2011. See Exhibit A, Defendant's RPD, No. 30.

On June 8, 2011, Plaintiff responded to Omega Flex's discovery, objecting that the request for claims information was irrelevant and immaterial, sought information not likely to lead to the discovery of admissible evidence, and was vague, unduly burdensome, and unreasonably broad in scope. See Exhibit B, Pl.'s Resp. to Defendant's RPD. Plaintiff further objected on the ground that the request sought the production and disclosure of confidential or proprietary business information. Ex. B, Pl.'s Resp. to Defendant's RPD.

## **LEGAL ARGUMENT**

**I.     UNITRIN SHOULD BE COMPELLED TO PRODUCE THE RELEVANT CLAIMS INFORMATION REQUESTED BY OMEGA FLEX**

Evidence of a product's risk—or lack thereof—is directly relevant and admissible to defend strict liability and negligence claims brought under Maryland law.  Unitrin exclusively possesses and has collected for its own use the very evidence necessary to assess the risks associated with TracPipe.  Omega Flex will likely be denied the ability to fully defend itself without this crucial risk evidence.  Omega Flex has tailored its requests to evidence directly relevant to Plaintiff's claims and Omega Flex's defense thereof, and Plaintiff offers no valid reason why they should be permitted to avoid Omega Flex's legitimate discovery requests.

### **A.     OMEGA FLEX'S DISCOVERY REQUESTS SEEK RELEVANT CLAIMS INFORMATION NECESSARY FOR OMEGA FLEX TO DEFEND THIS PRODUCTS LIABILITY ACTION**

The scope of discoverable material is considerably broader than that of admissible material:

> (1) Scope in General.  Unless otherwise limited by court order, the scope of discovery is as follows:  Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. . . .

FED. R. CIV. P. 26(b)(1).

"The burden is on the party resisting discovery to explain specifically why its objections, including those based on irrelevance, are proper given the broad and liberal construction of federal discovery rules."  Desrosiers v. MAG Industrial Automation Systems, LLC, 675 F.Supp.2d 598, 601 (D. Md. 2009).  However, in products liability cases, this Court has

sometimes required the requesting party to make a threshold showing of relevance. See The United Oil Co., Inc. v. Parts Assocs., Inc., 227 F.R.D. 404, 412 (D. Md. 2005). Upon demonstrating apparent relevance, the burden ultimately shifts to the resisting party to establish lack of relevance. Id. By contrast, at trial, the burden is on the offering party to establish the relevance of the evidence offered. Derosiers, 675 F.Supp.2d at 601.

Omega Flex seeks information relating to Unitrin's experiences with other lightning related residential loss claims. Unitrin objected to Omega Flex's request for this information, in part, on the grounds that it is irrelevant, immaterial, and not likely to lead to discovery of admissible evidence. Far from being objectionable, this information is directly relevant to several central issues in this case. Unitrin's other experiences with lightning-related claims will offer probative insight into the relative risk of using CSST and the existence (or non-existence) of safer alternatives. Moreover, the question of whether this evidence would meet admissibility requirements at trial is not at issue. Omega Flex has far surpassed the discovery rules' lower burden of showing apparent relevance and that it will, at the very least, lead to admissible information.

      **1.**    **Data Regarding Lightning Induced Fires Is Relevant to the Risk-Utility Analysis Required by Plaintiffs' Strict Liability Claim**

Although the Federal Rules of Civil Procedure do not define relevance for discovery purposes, this Court has recognized that "relevance for discovery purposes is viewed more liberally than relevance for evidentiary purposes." See United Oil, 227 F.R.D. at 409. Under the Federal Rules of Evidence, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. At the discovery stage of the litigation, "this Court does not impose on the requesting party the burden of establishing the substantial similarity of

the requested incidents and lawsuits. . . ." See Derosiers, 675 F.Supp.2d at 602. The claims data that Omega Flex seeks is well within the relevancy standard under the broader rules governing discovery.

When determining whether information is relevant and discoverable, the court should focus on the actual claims and defenses involved in the action, while keeping in mind the broad and liberal construction of the federal discovery rules. See United Oil, 227 F.R.D. at 410-11 (quoting commentary to the 2000 amendments to FED. R. CIV. P. 26).

Unitrin has brought strict products liability and negligence claims against Omega Flex. To prevail on a strict product liability claim under the Restatement (Second) of Torts, Section 402A, a plaintiff must prove that the product was both "defective" and "unreasonably dangerous" at the time it left the manufacturer's control. See Ziegler v. Kawasaki Heavy Industries, LTD, 539 A.2d 701, 704 (Md. Ct. Spec. App. 1988); Phipps v. General Motors Corp., 363 A.2d 955, 958 (Md. 1976). To make this determination, Maryland courts apply two different tests depending on whether the product malfunctioned as the result of a manufacturing error or whether the product functioned as intended, but the plaintiff alleges that the design is unreasonably dangerous. See, Lloyd v. General Motors Corp., 266 F.R.D. 98, 108 (D. Md. 2010) ("Lloyd I"). Where the product allegedly malfunctioned, the court applies the "consumer expectation" test, and where a design defect is alleged, the court applies the "risk-utility" test. Id. at 109.

In this case, Plaintiffs allege that the design of the CSST is defective because it is too thin to withstand a direct or indirect lightning strike, and thus unreasonably dangerous. See Ex. E, Eager Report at 11. As such, the risk-utility test should be applied. The risk-utility test has seven factors:

>   (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
>
>   (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
>
>   (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
>   (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
>   (5) The user's ability to avoid danger by the exercise of care in the use of the product.
>
>   (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
>
>   (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

Lloyd I at 108. Essentially, the product's relative risk of harm—or lack thereof—lies at the heart of the analysis.

To support his opinion that TracPipe is defective and unreasonably dangerous, Dr. Eagar repeatedly discusses in his report the probability of lightning-induced fires damaging CSST versus the probability of lightning-induced fires damaging black pipe. See Ex. E, Eagar Report at 10, ¶ 11 ("[m]y analysis given in Appendix A indicates that the 'odds' of CSST causing lightning induced fires is much greater than with black iron pipe"); see also Ex. E, Eagar Report at 3, ¶ 2 ("[t]he thin gauge of CSST makes CSST much less resistant to melting and perforation as compared to black iron pipe"); Ex. E, Eagar Report at 4, ¶ 4 ("CSST heats up approximately 300 times faster than iron pipe at the same current"); Ex. E, Eagar Report at 5, ¶ 4 ("[t]his analysis shows that carbon steel pipe with its thicker wall is more than ten times more resistant to perforation . . . as compared to CSST"); Ex. E, Eagar Report at 5, ¶ 6 ("the potential of initiating

9

an arc from one conductor to an adjacent conductor is several orders of magnitude greater with CSST as compared with the equivalent diameter of black iron pipe"); Ex. E, Eagar Report at 9, ¶10 ("it is irresponsible for Omegaflex to offer a product that has 50 times less capacity to resist perforation by a lightning strike"); Ex. E, Eagar Report at 10, ¶ 11 ("perforation of CSST by lightning is many times more hazardous than the perforation of black iron pipe by lightning"); Ex. E, Eagar Report at 10, ¶ 11 ("Stringfellow's data shows CSST has 35 to 65 times the failure rate of black iron pipe").

Ultimately, Dr. Eagar concludes that "the material properties and geometry of CSST make the probability of a lightning flash causing a hole due to either resistive heating or an electrical arc between adjacent electrical conductors many times more hazardous than use of steel pipe for transport of hydrocarbon gases." See Ex. E, Eagar Report at 11, ¶ 11. Thus, Dr. Eagar's opinion as to the relative safety of black pipe as compared with CSST is based entirely upon the thickness of the two products and their respective performance in the relatively rare occurrence of a lightning strike.

Omega Flex, for its part, contends that CSST is safer than black pipe in a number of other circumstances and its utility greatly outweighs any alleged improbable risk of danger posed by lightning strikes. See Exhibit G, Morse Report at 5-9. However, without the actual rates of lightning-induced fires or other damage in homes containing CSST versus homes containing black pipe, Omega Flex is unable to conduct its own analysis of the data to directly refute Dr. Eagar's conclusions. The requested claims data is directly relevant to Plaintiff's claims and Omega Flex's defenses in this products liability case in which the Court will apply the risk-utility test. Thus, Omega Flex is entitled to discover the data that exists solely in the hands of

Unitrin in order to fully challenge Dr. Eagar's opinions as to the odds of lightning-induced fires and the relative risks of CSST.

Moreover, under the risk-utility test, a product is considered to be defective in design when "the foreseeable risk of harm could have been reduced or avoided by the adoption of a reasonable alternative design." See Lloyd v. General Motors Corp., 275 F.R.D. 224, 229 (D. Md. 2011) ("Lloyd II").  Because Plaintiffs must prove the existence of a reasonable alternative design, the relative risks of lightning-induced fires are further implicated.  Dr. Eagar expressly acknowledges that in his report, he made an effort to calculate the relative risks of CSST versus the alternative, black iron pipe, in the event of a lightning strike. See Exhibit F, Eagar Dep. Tr. at 51:3-9.  He concludes that "the hazard rate for CSST is anywhere from 50,000 to a million times greater than it is for black iron pipe." Ex. F, Eagar Dep. Tr., at 51:16-17. Dr. Eagar also suggests as an alternative design, use of CSST in shorter lengths. See Ex. E, Eagar Report at 11, ¶ 11; see also Ex. F, Eagar Dep. Tr., at 85:21-86:4 (discussing the probability of a lightning-induced arc in long-length CSST versus short-length CSST).

In short, the nature of Plaintiff's claims and the anticipated expert testimony they will proffer to support those claims require a comparison of the utility and risks of CSST to alternative natural gas transport systems experiencing a lightning event.  Such comparison is not possible if Omega Flex is denied the limited access it seeks to lightning-related claims data, which exists solely in the hands of Unitrin.

### 2. Data Regarding Lightning Induced Fires Is Relevant to the Risk-Utility Analysis Required by Plaintiffs' Negligence Claim

Maryland law employs a similar risk-utility analysis to product liability claims sounding in negligence as to product liability claims asserting a design defect. See Watson v. Sunbeam Corp., 816 F.Supp. 384, 387 n.3 (D. Md. 1993) ("The elements of proof are the same whether the

11

claim be characterized as one for strict liability or negligence."). The primary distinction of a negligence products liability case is that the plaintiff must show a breach of the duty of due care, while in strict liability, the plaintiff must show that the product was unreasonably dangerous. See Higgins v. E.I. DuPont de Nemours & Co., 671 F.Supp. 1055, 1059 (D. Md. 1987).

> This duty of reasonable care in design rests on common law negligence that a manufacturer of an article should use reasonable care in the design and manufacture of his product to eliminate any *unreasonable risk* of foreseeable injury. The duty of reasonable care in designs should be viewed in light of the risk.

Tauber v. Nissan Motor Corp., 671 F.Supp. 1070, 1073 (D. Md. 1987) (emphasis added). Accordingly, evidence that proves the absence of a comparative risk of harm, such as the claims evidence sought here, is relevant and admissible.

### 3. Whether the Claims Data In the Exclusive Possession of Unitrin Is Admissible At Trial Is Not At Issue In This Discovery Dispute

At this point, Omega Flex only argues discoverability of the claims data.[1] The information is in the exclusive possession of Unitrin, and therefore, Omega Flex has no other way to access it. Having not yet seen the claims information, Omega Flex cannot articulate the potential uses of the information at trial. At this point, however, the information is certainly discoverable.

In United Oil, the court found that although the defendant was not required to establish the substantial similarity of other incidents involving a different product than the one at issue, substantial similarity was demonstrated "for *discovery purposes* by the limitation of the discovery request to other products containing the same admittedly liver toxic chemical

---

[1] While the information that Omega Flex seeks is discoverable, the burden for admissibility at trial is higher, and Omega Flex reserves the right to contest the admissibility of any other claim and/or incident proffered by Plaintiff.

constituents in the [subject] dyes." Id. at 412 (emphasis added). The United Oil court went on to note that:

> The refinement of the issue is for consideration *at trial*. Ultimately, the trial judge, with the assistance of expert scientific testimony, will determine whether notice as to other products (assuming there are claims, etc. for other products containing the subject chemical components) should be admitted for the jury's consideration on whether R& H had notice of the liver toxicity of xylene and ethyl benzene in the subject dyes by claims of liver damage due to exposure to other products containing the same chemical components . . . and whether other incidents involving the same chemical constituents demonstrate causation here.

Id. at 413 (emphasis added).

Similarly, Omega Flex has appropriately limited its discovery request by time, scope, and relevancy. First, Omega Flex only seeks claims information received by Unitrin between July 23, 2004 and July 23, 2009. Second, Omega Flex seeks only claims involving lightning damage to a one or two family residential building. Omega Flex therefore seeks information that forms the basis of Plaintiff's claims for the anticipated purpose of rebutting Plaintiff's allegations of defect, unreasonable danger, causation, and notice. As such, the claims experience information that Omega Flex seeks fits all of the bases for discoverability. Unitrin has exclusive possession of the material, and Omega Flex has every reason to believe that Unitrin—an insurance company in the business of assessing relative risks—possesses, obtains, uses, and/or can access data that will meet the broad requirements of the discovery rules.

  **4.**  **The Scope of Material Requested and the Alleged Burden To Producing This Relevant Evidence Is Reasonable and Unitrin Should Be Compelled to Produce the Requested Information**

In response to Omega Flex's request for the claims information, Plaintiff asserts that the request is "vague, unduly burdensome and is unreasonably broad in scope." See Ex. B, Pl.'s Resp. to Omega Flex's RPDs, ¶ 30. Contrary to Plaintiff's assertions, Omega Flex seeks, in good faith, information relevant to core issues of this case. Unitrin, an international insurance

company, is in the business of managing, comparing, and analyzing different risks in order to write policies based on those analyses. Omega Flex has every reason to believe—and no reason to doubt—that Unitrin maintains this information in the ordinary course of business. Omega Flex's request is tailored to the issues of this suit, and should be complied with.

Specifically, Omega Flex seeks the production of "all documents identifying the number of claims Unitrin Auto & Home Insurance Company . . . received between July 23, 2004 and July 23, 2009 that involved lightning damage to a one or two family residential building. See Ex. A, Omega Flex's RPDs to Plaintiff, ¶ 30. This request only seeks claims information for five years leading up to the date of the alleged fire at the Shamsher residence. Moreover, the request seeks a particular subset of claims information involving lightning damage to structures similar to the Shamsher residence. Therefore, Omega Flex's request is neither vague, nor unreasonably broad or burdensome. Nonetheless, Omega Flex remains willing to meet Unitrin's claims of burden with reasonable discussion and compromise, for instance, by protecting the personal information of claimants through a stipulated Protective Order.

Further, to the extent Plaintiff claims the request is overly burdensome, Omega Flex should have the opportunity to verify Unitrin's claimed burden by deposing a representative with knowledge of the company's search capabilities and methods of categorization and risk assessment pertaining to processing claims-related data. Plaintiff has made no good faith effort to comply with Omega Flex's request, produce any materials that may be responsive, or even conduct a preliminary search for the information. Thus, the deposition would serve to further narrow the scope of any additional inquiry and allow Omega Flex to specifically tailor further requests based upon the particular procedures used by the Plaintiffs-insurers. That, in turn, would keep the discovery costs to a minimum. The Court should compel Plaintiff to supply, at

the very least, documentary information that supports or verifies its asserted objection and would allow Omega Flex to determine whether any truth exists to Plaintiff's claims.

In short, Omega Flex has a right to defend itself against the lawsuit lodged against it by Unitrin, There is nothing special about the claims information Omega Flex seeks that would protect it from discovery, and Unitrin does not have the right to ignore discovery requests it merely finds inconvenient.

**B.     DISCOVERY SHOULD BE EXTENDED FOR THE PURPOSE OF OBTAINING THE REQUESTED CLAIMS INFORMATION**

The deadline for the close of discovery in this matter was scheduled by the Court as March 30, 2012. On that same date, the parties submitted a Status Report to this Court, which indicated that written discovery was complete and that two fact witness depositions were scheduled to take place after the date of the Status Report. See Exhibit H, Status Report On Discovery dated March 30, 2012. In addition, the parties scheduled depositions of Plaintiff's experts to take place after the discovery end date on May 4, 2012, May 16, 2012, May 22, 2012, and May 31, 2012. Likewise, the depositions of Omega Flex's experts took place after the scheduled date for the close of discovery, on June 5, 2012, June 7, 2012, and June 12, 2012. However, the discovery deadline has not been amended formally to account for these events.

Despite Omega Flex's efforts to obtain the requested claims information, it has not been able to do so as Plaintiffs are in exclusive possession of the information. Moreover, after the recent deposition of Plaintiff's expert, Dr. Eagar, the relevancy and need for the requested information became clearer. Because discovery is ongoing by agreement of the parties and for all of the reasons stated in this Memorandum of Law, Omega Flex respectfully requests that this

15

Court grant a limited discovery extension for the purpose of obtaining full and complete responses to its Requests for Production of Documents.

## **CONCLUSION**

For the reasons set forth above, Defendant Omega Flex, Inc. respectfully requests that this Honorable Court compel full and complete answers to Omega Flex's Requests for Production of Documents, No. 30, and order Plaintiff to produce for deposition a Unitrin corporate representative with knowledge of the company's search capabilities and methods of categorization and risk assessment for claims-related data. Defendant, Omega Flex, Inc. further requests that this Court grant a limited discovery extension for purposes of obtaining the information sought by this Motion.

*/s/  Donald S. Meringer*
Donald S. Meringer (Federal Bar #24408)
David J. Quigg (Federal Bar #26401)
MERINGER, ZOIS & QUIGG, LLC
320 North Charles Street
Baltimore, Maryland 21201
(443) 524-7978
(443) 524-7982 Fax

*/s/*
Lynne M. O'Brien (Admitted *Pro Hac Vice*)
Campbell, Campbell, Edwards & Conroy, P.C.
Chesterbrook Corporate Center
690 Lee Road, Suite 300
Wayne, PA  19087
(610) 964-1900

*Attorneys for Defendant, Omega Flex, Inc.*

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this 12th day of June, 2012, a copy of the foregoing *Omega Flex, Inc.'s Motion to Compel Full and Complete Responses to Defendant's Request for Production of Documents and Omega Flex, Inc.'s Memorandum of Law* in support thereof was filed via ECF with the Court, which will serve copies on the following counsel of record:

Richard L. Flax, Esquire
Law Offices of Richard L. Flax, LLC
29 West Susquehanna Avenue
Suite 500
Baltimore, MD 21204
*Counsel for Plaintiff*

Mark E. Utke, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
*Counsel for Plaintiff*

Roger W. Heald, Esquire
11130 Fairfax Blvd., Suite 310
Fairfax, VA 22030
*Counsel for Defendant, K. Hovnanian Homes Of Maryland, LLC*

David L. Rubino, Esquire
McCarthy Wilson LLP
2200 Research Blvd., Suite 500
Rockville, MD 20850
*Counsel for Defendant, Guardian Plumbing Services, Inc.*

Steven R. Migdal, Esquire
Buck Migdal and Myers Chartered
23 West St., P.O. Box 2400
Annapolis, MD 21404-2400
*Counsel for Defendant, C & R Electric, Inc.*

                                            */s/ David J. Quigg*
                                            David J. Quigg